**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RUSSELL WILLIAMS,** <br> **Plaintiff** <br><br> **v.** <br><br> **THE CITY OF PHILADELPHIA and KELLY RYCEK as administratrix of the estate of DETECTIVE LAWRENCE GERRARD, and NIKOLE BRONGO a.k.a. NICOLE FORD as administratrix of the estate of DETECTIVE ERNEST GILBERT** <br><br> **Defendants.** | : | **Civil Action** <br> **No.: 2:26-CV-08323** <br><br> **Jury Trial Demanded** |

## PLAINTIFF'S ORIGINAL COMPLAINT

**NOW COMES** Russell Williams, by and through Mark V. Maguire, Esquire of McEldrew Purtell, complaining of Defendants, Detective Lawrence Gerrard and Detective Ernest Gilbert. In support thereof, Plaintiff avers as follows:

## NATURE OF THE COMPLAINT

1. In 1984, Plaintiff Russell Williams ("Mr. Williams") was wrongfully convicted of murder and sentenced to life without parole.
2. Mr. Williams' arrest and prosecution was replete with due process violations. Philadelphia Police Department ("PPD") detectives Lawrence Gerrard ("Gerrard") and Ernest Gilbert ("Gilbert") coerced witnesses, fabricated evidence, engaged in deliberate deception by concealing and suppressing material evidence, employed unlawful investigative techniques, presented false testimony, and, together with other law enforcement officials, deprived Mr. Williams of a fair trial.

3. After Mr. Williams served forty-one years of his sentence, the Philadelphia District Attorney's Office ("DAO") conceded that Mr. Williams's prosecution violated his due process rights, and the Court of Common Pleas vacated Mr. Williams' conviction.

4. The deprivation of Mr. Williams' due process rights was accomplished by way of a scheme, subsequently exposed and commonly known as "sex for lies".

5. Under this scheme Gerrard and Gilbert offered incarcerated informants sexual liaisons, drugs, bail reductions, and leniency on pending or potential criminal charges in exchange for false, coordinated statements implicating targets of the detectives' choosing, including Mr. Williams.

6. The conduct of Gerrard and Gilbert was the result of PPD policies, practices, and customs, as well as a pattern of deliberate indifference on the part of City of Philadelphia ("City") which endorsed and encouraged PPD detectives to investigate and prosecute in a manner that violated the due process rights of individuals like Mr. Williams.

7. Mr. Williams now brings this action under 42 U.S.C. § 1983 seeking redress for the extraordinary misconduct of Gerrard and Gilbert in violation of the Fourteenth Amendment of the United States Constitution.

**JURISDICTION**

8. This action is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343(1), (3), (4) and the aforementioned statutory provision. Plaintiff further invokes the supplemental jurisdiction of this Court under 28 U.S.C. § 1367(a) to adjudicate state law claims.

**PARTIES**

9. Plaintiff Russell Williams is an adult individual and a resident of Pennsylvania.

10. Defendant Kelly Rycekis the administatrix of the estate of Lawrence Gerrard who was at all times relevant to this action a Philadelphia Police Department detective acting under color of state law.

11. Defendant Nicole Brongo Ford a.k.a. Nicole Ford is the administratrix of the estate of Ernest Gilbert was at all times relevant to this action a Philadelphia Police Department detective acting under color of state law.

12. Defendant City of Philadelphia is a municipality of the Commonwealth of Pennsylvania and owns, operates, manages, directs and controls the Philadelphia Police Department. At all times relevant to this action City of Philadelphia employed Defendants Lawrence Gerrard and Ernest Gilbert as detectives.

## FACTUAL ALLEGATIONS

### THE MURDER

13. On October 27, 1982, Fred Rainey ("Rainey") was shot and killed on the northeast corner of 27th and Oxford Streets in North Philadelphia.

14. Rainey had been standing near a car when an argument broke out between Rainey and the car's occupants.

15. As the argument escalated, Rainey turned and ran down 27th Street toward Columbia Avenue. Shots were fired at Rainey from inside the car, through the front passenger window, as the car pulled away from the curb.

16. Rainey collapsed after being struck, and the car sped off down 27th Street without any of its occupants ever exiting the vehicle.

17. Rainey subsequently died from the gunshot wounds he sustained.

18. PPD detective Roger Harmon ("Harmon") was assigned as the lead investigator of the Rainey murder.

19. Under Harmon's direction, PPD detectives obtained statements from four eyewitnesses in the aftermath of the murder: (1) Theodore Young ("Young"), a thirteen-year-old neighborhood resident who knew Rainey, interviewed roughly an hour after the shooting; (2) Robert Bentley ("Bentley"), a twenty-five-year-old neighborhood resident, interviewed about ninety minutes after the shooting; (3) Patricia Alsbrook ("Alsbrook"), a twenty-one-year-old woman, interviewed approximately three hours after the shooting; and (4) Anthony Lambert ("Lambert"), a thirteen-year-old, interviewed several days later.

20. None of the four witnesses who spoke with police in the aftermath of the murder were in custody, under arrest, or had any interest in the outcome of the investigation.

21. (1) Young told detectives that he saw Rainey talking into a car parked on the corner of 27th and Oxford, that Rainey then ran several steps down 27th Street, that he heard two shots come from the car, and that Rainey fell. Young stated that he then hid behind a parked car until he saw the shooters' car pull away, and that he saw no one else on the street at the time.

22. (2) Bentley told detectives that he saw Rainey arguing in a low tone with two men in a blue Gremlin, that Rainey was standing next to the passenger side of the car, that Rainey then began running toward Columbia Avenue, that the Gremlin pulled out of its parking spot as the passenger fired at Rainey, and that Rainey collapsed as the Gremlin sped off and turned onto Columbia Avenue. Bentley specifically stated that the shots came from the passenger side of the car, where he saw the pistol emerge from the window.

23. (3) Alsbrook told detectives that she heard a shot from the direction of 27th and Oxford and saw a man holding a gun out the window of a light-colored car with tinted glass, that the gun

fired four more times, that Rainey attempted to run after the first shot but fell after the subsequent shots, and that the car then drove north on 27th Street past her.

24. (4) Lambert told detectives that he heard tires screeching and saw a car skid around the corner of 27th and Oxford, that he then heard gunshots, that he saw Rainey, who had been trying to run toward his house, fall to the ground, and that the car sped off as Rainey fell. Asked whether anyone got out of the car, Lambert said no. Asked whether he saw where the shots came from, Lambert said they came from inside the car.

25. All four of these contemporaneous, disinterested eyewitnesses gave accounts that were consistent with one another in every material respect: the shots were fired from inside the car, through the passenger window, as the car was already in the process of driving away; none of the car's occupants ever got out of the vehicle at any point during the argument, the shooting, or the car's flight from the scene.

26. None of the four contemporaneous, disinterested eyewitnesses ever identified Mr. Williams as being on the scene of the murder.

27. Harmon's investigation did not identify any suspects and the case went cold.

**THE COLD CASE SQUAD GETS INVOLVED**

28. At the time of Rainey's murder, PPD and DAO were under public pressure to improve homicide "clearance" rates.

29. PPD's response was reliance on a Homicide Division "cold case squad" to reevaluate unsolved murders.

30. Detectives assigned to the cold case squad had a financial incentive to generate arrests and secure statements from suspects and witnesses: detectives were compensated for court

appearances, and working cases around the clock to produce chargeable statements inflated the hours for which detectives could get overtime pay.

31. Two of the cold case squad detectives were Gerrard and Gilbert.

32. The Rainey murder investigation was assigned to Gerrard and Gilbert, who set out to identify a suspect notwithstanding the absence of any eyewitness identification implicating anyone.

33. Gerrard and Gilbert settled on Mr. Williams.

34. Gerrard and Gilbert disregarded the four eyewitness accounts establishing that the shots had been fired from inside the car and that none of the occupants had ever exited the vehicle.

35. In place of that evidence, Gerrard and Gilbert manufactured a theory wherein Mr. Williams and others exited the car, confronted Rainey, chased Rainey down the street and shot him.

36. This new theory was contradicted by every genuine, disinterested witness to the shooting.

37. In order to construct this new theory and insert Mr. Williams into it, Gerrard and Gilbert turned to fabricated statements elicited from individuals with self-serving reasons to cooperate who were not actually present at the scene of the murder.

**FABRICATED STATEMENTS**

38. The case that Gerrard and Gilbert built against Mr. Williams rested entirely on fabricated statements from four individuals: Edward Williams, Charles Atwell ("Atwell"), Marvin McClain ("McClain"), and Archie Scott ("Scott").

39. Each of these four statements was obtained under circumstances designed to create, rather than uncover, evidence against Mr. Williams.

***Edward Williams***

40. On January 26, 1983, three months after Rainey's murder, Edward Williams was detained by store security for shoplifting.

41. Edward Williams was a heroin addict desperate to be released from custody.

42. The store security guard who detained Edward Williams was a retired PPD homicide detective, who delivered Edward Williams directly to Gerrard and Gilbert rather than processing him through ordinary channels.

43. While Edward Williams remained in custody and in the grip of his addiction, Gerrard and Gilbert coerced a statement from him that both identified Plaintiff Mr. Williams as one of Rainey's shooters and supplied a motive for the murder.

44. Edward Williams' coerced statement purported to provide both motive and eyewitness testimony to a murder that, on its own terms, occurred at two different locations on two different days, a fact that alone should have alerted Gerrard and Gilbert that the statement was unreliable.

45. Immediately after giving that statement, Edward Williams was released without being formally charged with any crimes.

46. Edward Williams' statement later became the foundation of the Affidavit of Probable Cause used to arrest Plaintiff Mr. Williams, as well as the Affidavit of Probable Cause used to arrest co-defendants Andre Harvey ("Harvey"), Howard White ("White"), and Robert Harrison ("Harrison").

47. Edward Williams was never presented to testify at the preliminary hearing of Plaintiff Mr. Williams, Harvey, or White. He was, however, the Commonwealth's sole witness at the separate preliminary hearing of the fourth co-defendant, Harrison, conducted by Assistant District Attorney ("ADA") James Long.

48. Edward Williams recanted his fabricated statement under oath on July 14, 1983, at Harrison's preliminary hearing and continues to disavow his fabricated statement to this day.

49. Edward Williams' recantation caused the charges against Harrison to be dismissed outright, yet it was never disclosed to Plaintiff Mr. Williams' counsel.

50. Gerrard, together with the prosecutor assigned to Plaintiff Mr. Williams' case, later worked to obscure Edward Williams' recantation and his whereabouts at the time of trial from the trial judge, the jury, and Plaintiff Mr. Williams's counsel.

***Charles Atwell***

51. Atwell made no statement related to Rainey’s murder until June 1, 1983, more than seven months after Rainey's murder.

52. Atwell made contact with police only after he had been arrested for the aggravated assault of Floyd Sutton (“Sutton”) and James Mitchell (“Mitchell”) and was designated a career criminal subject to a mandatory minimum sentence.

53. Atwell's initial statement was spare: it claimed that, at the time that Rainey was murdered, he and Marvin McClain were standing on a nearby corner, that a blue Gremlin carrying three men stopped near Rainey, that the three men got out and began shooting when Rainey ran, and that Atwell and McClain then ran toward the scene as the car sped away.

54. At the time he made this statement, Atwell was the prime suspect in the murder of Benjamin McNeil (“McNeil”), committed on October 18, 1980.

55. Three separate witness statements identified Atwell as having committed the McNeil murder at Rainey's direction.

56. The McNeil investigation file also contained police photographs and demographic information regarding Atwell, and Detective Gerrard's own Investigation Report.

57. Gerrard and Gilbert knew that Atwell was the lead suspect in the McNeil murder, yet the investigation was marked closed under "special circumstances" while Atwell was cooperating with Gerrard and Gilbert and fabricating statements against Mr. Williams.

58. Gerrard and Gilbert became involved in the McNeil homicide investigation in January 1983, after Rainey's murder and shortly before Atwell was developed as the Commonwealth's star witness against Mr. Williams.

59. Rather than investigating Atwell as a suspect in the McNeil homicide, Gerrard caused the McNeil investigation to be exceptionally closed, through the Assistant District Attorney, notwithstanding that there is no documentation that Atwell was ever eliminated as a suspect.

60. In exchange for his fabricated statement, Atwell's bail on his pending aggravated assault charges was reduced from $40,000 to $12,000, and those charges were ultimately dismissed entirely.

61. Atwell was also provided with improper jailhouse visits and other benefits in violation of PPD Directive 82.

62. Specifically, Gerrard and Gilbert facilitated at least eight visits, each lasting up to approximately three hours, between Atwell and his girlfriend, Maxine Harris ("Harris"), at the Police Administration Building ("PAB"), for the purpose of sexual contact.

63. These visits are documented in PAB visitor logs and are further corroborated by a sworn affidavit from Harris.

64. Atwell's nephew, Doug Atwell, has provided a sworn affidavit further corroborating that Atwell received access to drugs through Gerrard and Gilbert while detained at the PAB, also in violation of Directive 82.

65. Despite all of the benefits Atwell received in exchange for his fabricated statement, Gerrard falsely testified that Atwell received nothing of value beyond a transfer from the Detention Center to Holmesburg Prison for his own safety.

***Marvin McClain***

66. McClain worked for Atwell in the narcotics business and was known as his "lackey" by those in the neighborhood where they operated.

67. McClain offered himself as an alibi witness for Atwell in his aggravated assault of Mitchell and Sutton. The alibi was demonstrably false and inconsistent with the victim's statements.

68. Atwell referred Gerrard and Gilbert to McClain in order to further ingratiate himself with the detectives providing him leniency and access to sex.

69. McClain provided a statement to Gerrard and Gilbert on June 2, 1983, the day after Atwell's statement.

70. McClain fabricated a statement which was procured under the same set of circumstances as Atwell's and calibrated to align with it.

***Archie Scott***

71. Scott provided a fabricated statement to Gerrard and Gilbert on June 22, 1983, implicating Mr. Williams in the murder.

72. Scott's bail was reduced that same day that he provided the fabricated statement.

73. Scott recanted his statement directly to the prosecutor, ADA George Shotzbarger ("Shotzbarger"), while the case was being prepared for trial.

74. As with Edward Williams' recantation, Scott's recantation was never disclosed to Plaintiff Mr. Williams' counsel.

75. These four statements, obtained from a heroin addict facing pending charges, a career criminal facing a mandatory minimum sentence, his lackey and admitted alibi witness and associate, and a fourth cooperator who ultimately recanted, constituted the entire evidentiary basis for the case against Russell Williams.

**MANIPULATED PROBABLE CAUSE AFFIDAVITS**

76. Having secured the fabricated statements of Edward Williams, Atwell, McClain, and Scott, Gerrard prepared and submitted an Affidavit of Probable Cause seeking a warrant for Plaintiff Mr. Williams's arrest for the Rainey murder.

77. The affidavit Gerrard submitted was replete with inaccuracies, misquoted statements, fabricated assertions, and material omissions, each designed to manufacture probable cause and conceal the substantial body of exculpatory evidence that contradicted the theory Gerrard and Gilbert had constructed.

78. Each fabrication and omission relating to Officer Felke's investigation is set out below, alongside the evidence Gerrard actually possessed and what an accurate affidavit would have stated.

***Fabrication/Omission No. 1: Felke's identification of witnesses.***

79. Gerrard's affidavit represented that Officer Thomas Felke ("Felke"), the officer who had taken statements from eyewitnesses at the scene, identified only a single witness, Robert Bentley.

80. In fact, Felke's own investigative statement reported that he had located two witnesses, Bentley and Theodore Young, both of whom stated that they saw two men inside a blue Gremlin shooting at Fred Rainey as he ran down 27th Street.

81. An accurate affidavit would have disclosed that Felke identified both Bentley and Young, and that both witnesses described the shooting as coming from inside the vehicle.

***Fabrication/Omission No. 2: the fabricated Felke statement.***

82. Gerrard's affidavit fabricated a statement attributed to Felke referencing only Bentley, omitting any mention of Young altogether.

83. Felke's actual statement contained no such limitation, and affirmatively stated that the shots came from inside the car.

84. An accurate affidavit would have quoted Felke's statement in full, including his account that the shots were fired from inside the vehicle, the central fact Gerrard needed to omit to support the theory that Williams and others exited the car and chased Rainey on foot.

***Fabrication/Omission No. 3: the misquotation of Bentley.***

85. Gerrard's affidavit misquoted Bentley directly, representing that "the passenger of this Blue Gremlin started shooting at Fred Rainey."

86. Bentley's actual statement was that the Gremlin had pulled out of its parking spot and that its passenger began shooting from inside the car as it left, meaning the shooting occurred while the car was already in motion and the passenger never exited it.

87. An accurate affidavit would have quoted Bentley's full statement, including that the shooting occurred from inside the moving vehicle, a detail that directly contradicted the theory that Williams and others had exited the car and chased Rainey on foot.

***Fabrication/Omission No. 4: the omission of three additional eyewitnesses.***

88. Gerrard's affidavit omitted entirely the statements of eyewitnesses Theodore Young, Patricia Alsbrook, and Anthony Lambert.

89. All three were neutral, contemporaneous witnesses whose accounts were consistent with Bentley's actual statement and with one another, and all three confirmed that the shooting came from inside the car and that none of the occupants ever exited the vehicle.

90. An accurate affidavit would have disclosed all three witnesses' accounts, none of which supported the Commonwealth's eventual theory that Mr. Williams exited the vehicle.

91. None of these three witnesses were in custody, under arrest, facing charges, or in any position to benefit from their statements.

92. Gerrard omitted their accounts from the affidavit because they could not be reconciled with the false narrative he and Gilbert had constructed to implicate Mr. Williams.

***Fabrication/Omission No. 5: Edward Williams' statement, motive, and custodial status.***

93. The affidavit relied on Edward Williams' statement as both the source of Plaintiff Mr. Williams' supposed motive and the initial identification of Plaintiff Mr. Williams as a participant in the murder, without qualification.

94. Gerrard's affidavit did not disclose that Edward Williams gave his statement while in custody, suffering from heroin addiction, facing an unrelated retail-theft arrest, and that Edward Williams was released without ever being charged after providing the statement Gerrard and Gilbert sought.

95. An accurate affidavit would have disclosed the circumstances under which Edward Williams' statement was obtained, including his custodial status, his addiction, and his release without charges immediately afterward.

***Fabrication/Omission No. 6: Edward Williams' recantation.***

96. The affidavit represented Edward Williams' statement as reliable, undisclosed evidence supporting probable cause.

97. The affidavit did not disclose that Edward Williams would go on to recant that statement, under oath, on at least three separate occasions, beginning within months of giving it.

98. An accurate affidavit, or a supplemental disclosure once the recantation occurred, would have informed the court and the defense that the Commonwealth's own motive witness had recanted.

***Fabrication/Omission No. 7: Atwell's inducements.***

99. The affidavit presented Atwell's statement as the product of voluntary cooperation.

100. Gerrard's affidavit omitted that Atwell had been induced to provide his statement through a bail reduction on pending charges, improper jailhouse visits arranged in violation of Police Directive 82, and other benefits that ultimately contributed to the complainants in Atwell's own pending criminal cases dropping the charges against him.

101. An accurate affidavit would have disclosed the bail reduction, the Directive 82 violations, and the dropped charges as inducements bearing on Atwell's credibility and motive to fabricate.

**Fabrication/Omission No. 8: McClain's relationship to Atwell.**

102. The affidavit presented McClain's statement as independent corroboration of Atwell's account.

103. The affidavit did not disclose that McClain, who came forward with a corroborating statement one day after Atwell provided his own, was Atwell's close associate and had already been listed as Atwell's alibi witness in an unrelated criminal matter, an alibi later shown to be false.

104. An accurate affidavit would have disclosed McClain’s relationship to Atwell and his role as Atwell’s alibi witness, information directly bearing on the independence and reliability of his corroboration.

105. Through these fabrications and material omissions, Gerrard obtained a legally deficient arrest warrant for Plaintiff Russell Williams, and the prosecution against him was initiated on that basis.

**PRETRIAL PROCEEDINGS AND DISCOVERY**

106. Well before Mr. Williams' trial, the Philadelphia Police Department had identified other viable suspects in the Rainey shooting whom Gerrard and Gilbert never disclosed to Mr. Williams' defense.

107. Police had identified a man known as "Boozer" (George Boozer), whom an eyewitness placed inside the car from which Rainey was shot and who had separately been heard to say he wanted to kill Rainey. This information was contained within the DAO's own file relating to the Rainey murder but was not produced to Mr. Williams' trial counsel and was not disclosed to the defense until the current post-conviction proceeding.

108. The Commonwealth's file likewise contained additional alternative-suspect information that was withheld from the defense at the time of trial. One withheld document identifies "Smokey" (Howard White), an individual referred to as "Wine," and the owner of the Turner Bar as alternative suspects in the Rainey murder.

109. A second withheld document identifies "Leo" (Robert Harrison), "Smokey" (Howard White), and "Juan" (Wine) as trigger men, and separately identifies individuals referred to as "Hot Shot," "Lamont," and "Tommy," as well as Charlie Atwell himself, as alternative suspects in the Rainey murder, meaning that police possessed, and did not disclose,

documentation identifying the Commonwealth's own star witness against Mr. Williams as an alternative suspect in the very murder for which Mr. Williams was being prosecuted.

110. None of this alternative-suspect information, regarding Boozer, Smokey, Wine, the Turner Bar owner, Hot Shot, Lamont, Tommy, or Atwell himself, was disclosed to Mr. Williams' trial counsel or presented to the jury, notwithstanding that it was contained within files in the possession of the police and the DAO at the time of trial.

111. Police also learned that a man named James Hampton ("Hampton") had told others, only two days after the shooting, that he had just shot and killed someone at the intersection where Rainey was killed, describing details of the shooting, including that the victim had been shot in the stomach and the head, that had not been made public.

112. Hampton became a suspect after Police Officer Cummings responded to a call in which local business owner John McCullough ("McCullough") reported that Hampton and Hampton's bodyguard had threatened him at gunpoint and made statements indicating their involvement in the Rainey murder.

113. Officer Cummings's statement recorded that Hampton was carrying a .38 caliber Chief Special revolver, the same caliber weapon that killed Rainey, and that when Hampton and his associate spoke about "killing someone on 27th Street," McCullough understood them to be referring to the shooting of Rainey.

114. The statement of Officer Cummings and at least two related Activity Sheets documenting this identification of Hampton as an alternative suspect, dated October 29, 1982, were not produced to the defense prior to trial.

115. The John McCullough witness statement that was produced to the defense before trial was materially incomplete: its first sentence incorrectly states that McCullough knew nothing

about the Rainey murder, and the balance of the statement omits the material information contained in Officer Cummings's statement and the related Activity Sheets.

116. Hampton was found in possession of a .38 caliber handgun, the same caliber that killed Rainey, yet police made no effort to test that weapon against the projectiles recovered from Rainey's body.

117. The .38 caliber bullets recovered from Hampton in connection with the McCullough incident were confiscated by police but were never entered into evidence or subjected to ballistic testing, and were effectively destroyed.

118. None of this information regarding Boozer, Hampton, or the additional alternative suspects was disclosed to Williams's trial counsel or presented to the jury.

119. At trial, the ADA nonetheless compounded the concealment of the Hampton evidence by affirmatively using evidence connected to Hampton to fabricate a false "multiple shooter" theory against Mr. Williams.

120. When Officer Cummings responded to the McCullough threat call described above, he recovered a .380 caliber cartridge that had been thrown at McCullough by Hampton's bodyguard, in the course of the same incident in which Hampton described his own involvement in the Rainey murder.

121. This .380 cartridge had no connection whatsoever to the Rainey shooting: it was recovered from a different location than the murder, two days after the murder, and was a different caliber than the other ballistics evidence connected to the Rainey shooting.

122. Notwithstanding its lack of connection to the crime, the ADA entered the .380 cartridge into evidence at Mr. Williams' trial without disclosing its true origin, that it came from the Hampton incident and had nothing to do with Rainey's murder.

123. The only legitimate evidentiary basis for introducing the .380 cartridge at trial would have been if Hampton or his bodyguard, rather than Mr. Williams, were the defendants.

124. At trial, co-defendant Harvey's defense counsel Barry Denker attempted to cross-examine the Commonwealth's ballistics witnesses regarding the true origin of the .380 cartridge, including where it was recovered and from whom.

125. The ADA repeatedly objected to and blocked this line of questioning, and the trial court sustained those objections, preventing defense counsel from eliciting the cartridge's true provenance from the Firearms Identification Unit ("FIU") examiner who had prepared the underlying property receipt.

126. The introduction of the unrelated .380 cartridge, without disclosure of its true origin, supported and reinforced the false "multiple shooter" theory consistent with Atwell's and McClain's fabricated account of the shooting, a theory requiring that the shooters be standing outside the vehicle, in contradiction of every disinterested eyewitness.

127. The ADA further amplified the false "multiple shooter" theory by eliciting testimony from Medical Examiner Dr. Paul Hoyer that he recovered "one bullet and one deformed bullet" from Rainey's body, testimony the ADA knew to be inaccurate, because an Activity Sheet dated October 29, 1982, documented that Dr. Hoyer had told Detective Lagera that two .38 caliber projectiles were recovered from the decedent.

128. The ADA also elicited testimony from ballistics examiner James Fort consistent with a theory that there were five bullets in evidence and five bullet wounds, supporting a multiple-shooter narrative that was contradicted by the pathology and ballistics evidence, which is instead consistent with Rainey being shot while leaning into the vehicle.

129. Nor did the Commonwealth disclose that Charles Atwell, its central trial witness against Williams, was himself the prime suspect in the unrelated homicide of Benjamin McNeil, a killing that witnesses placed Atwell committing at Rainey's own direction, as described above.

130. This information, which would have shown the jury that Atwell testified against Mr. Williams to avoid prosecution for a murder of his own, was never turned over to the defense, either before or during Mr. Williams' trial.

131. In 1996, years after Mr. Williams' conviction, and during co-defendant Harvey's second Post-Conviction Relief Act ("PCRA") proceeding before the Honorable Genece Brinkley, co-defendant Harvey's post-conviction counsel, George Newman, Esquire, filed a Motion to Compel Discovery Pursuant to Pa.R.Crim.P. 305 specifically seeking the McNeil homicide file, explaining to the court on August 26, 1996 that "the word on the street was that Atwell killed McNeil" and that the file was necessary to prepare Mr. Williams' defense.

132. At the August 26, 1996, hearing on that Motion to Compel, ADA Robin Godfrey opposed the motion on behalf of the Commonwealth, characterizing it as a "fishing expedition" and representing to the court that she was uncertain whether any activity sheets relating to the McNeil investigation even existed.

133. Judge Brinkley granted the Motion to Compel and ordered the Commonwealth to produce the McNeil file materials by October 3, 1996. The Commonwealth did not timely comply.

134. Harvey's counsel sent a deficiency letter to ADA Godfrey advising that, because the District Attorney's Office and the police are considered one entity for discovery purposes, it was incumbent on the Commonwealth to obtain the documents from the police and produce them in accordance with the court's order.

135. In response, the Commonwealth produced only three pages purporting to be activity sheets from the McNeil file.

136. None of the three pages identified Atwell as a suspect in the McNeil homicide, notwithstanding that the underlying investigative file, including the four Michael White statements, the Mary White statement, the Craig Kemp statement, the Officer Hartman statement, Atwell's mugshot and demographic information, and Detective Gerrard's own Investigation Report, plainly did.

137. The exclusion of any reference to Atwell as a McNeil suspect from the materials produced in 1996 directly and materially impacted the scope of cross-examination at the February 18–19, 1997 PCRA evidentiary hearing before Judge Brinkley, at which Atwell was called by the Commonwealth to testify and was not cross-examined regarding his suspect status in the McNeil homicide, because Harvey's counsel did not have the documents necessary to do so.

138. The complete McNeil homicide file was not produced to Mr. Williams' co-defendant, Andre Harvey, until November 21, 2023, nearly three decades after Judge Brinkley first ordered its production.

139. Upon receiving the complete file, Mr. Williams learned that: (1) Atwell was in fact a chief suspect in the McNeil homicide; (2) the detectives assigned to the McNeil investigation were Gerrard and Gilbert, the same detectives who developed Atwell as a witness against Mr. Williams; and (3) Gerrard had caused the McNeil investigation to be closed without ever investigating Atwell, immediately following Rainey's death.

140. The Commonwealth's concealment extended to its own key witness, Edward Williams.

141. Although Edward Williams had recanted his statement implicating Plaintiff Mr. Williams under oath at Robert Harrison's preliminary hearing months before Plaintiff Mr. Williams'

trial began, testimony that led to the dismissal of the charges against Harrison, the prosecution never disclosed that recantation to Plaintiff Mr. Williams' defense.

142. Instead, at trial, the prosecutor elicited testimony creating the false impression that Edward Williams remained an inculpatory witness whom police simply could not locate to bring before the jury.

143. Police witnesses testified to their supposedly diligent, unsuccessful efforts to find Edward Williams and serve him with a subpoena.

144. In truth, and contrary to what the jury was told, a handwritten note contained in the file, never disclosed to the defense, reflected that Edward Williams' location at a Coatesville hospital was known to law enforcement during the very period the prosecution was representing to the jury that he could not be found.

145. None of the withheld evidence concerning Boozer, the additional alternative suspects, Hampton and the .380 cartridge, Atwell's undisclosed role in the McNeil homicide, or Edward Williams' known whereabouts and recantation was contained in the discovery furnished to Plaintiff Mr. Williams' trial counsel.

146. As a result, counsel had no opportunity to investigate these alternative leads, to impeach Atwell's credibility with evidence of his own exposure for an uncharged murder, to challenge the fabricated ballistics evidence used to construct the multiple-shooter theory, or to challenge the prosecution's representations to the jury regarding Edward Williams.

147. This evidence remained concealed within law enforcement files for decades, coming to light only after Mr. Williams's defense team was permitted to review tens of thousands of pages of records beginning in 2021 and 2022.

**THE TRIAL**

148. Williams proceeded to a jury trial before the Honorable Francis A. Biunno.

149. The only evidence the Commonwealth offered at trial to place Mr. Williams at the scene of the shooting came from two witnesses: Charles Atwell and his close associate Marvin McClain, neither of whom had come forward until months after the murder, and only after Atwell had been arrested on unrelated aggravated assault charges and identified himself to Gerrard and Gilbert as someone willing to cooperate.

150. At trial, Atwell testified to a substantially more detailed and more damning version of events than the one he had given in his original June 1, 1983 statement.

151. Where his initial statement had said only that three men got out of a car, began shooting, and drove off, Atwell's trial testimony added a series of new claims that had appeared nowhere in his earlier account: that the three men stood in a "zig zag line" up 27th Street; that he watched their arms "jerking" as they fired; that Fred Rainey had his hands raised in the air; and, critically, that he could identify the three shooters by name as Howard White, Russell Williams, and Andre Harvey.

152. Atwell testified that he and McClain stood together on the corner of Bailey and Oxford Streets, roughly a block from the shooting, when the car carrying the three men passed them, that the men got out and confronted Rainey, that Rainey fled and was chased around the corner while being shot, and that Atwell then ran to the scene and saw the car driving off and Rainey on the ground.

153. McClain's trial testimony corroborated Atwell's account, but McClain's own initial statement, given the day after Atwell's, on June 2, 1983, was inconsistent with the version McClain and Atwell would ultimately present to the jury, including as to where each man stood, what each man saw, and when.

154. Atwell testified that the incident lasted approximately fifteen seconds and that he arrived at the scene first, before the Gremlin had pulled away; McClain testified that the incident took ten to fifteen minutes, that he arrived after Atwell, and that he saw Harvey kicking Rainey while Rainey was on the ground, a detail Atwell did not describe and did not himself claim to witness.

155. McClain's statement and testimony placed him as Atwell's alibi witness in Atwell's own pending assault case, and McClain had every incentive to align his account with Atwell's.

156. Atwell's and McClain's testimony, that a blue Gremlin pulled up to the corner of 27th and Oxford and that three or four occupants, including Mr. Williams, got out of the vehicle and shot Rainey from outside the car, was diametrically opposed to the contemporaneous, disinterested eyewitness testimony described above, which established that Rainey was shot from inside the moving vehicle and that none of the occupants ever exited the car.

157. The jury was not told that Atwell had been a career criminal facing a five-year mandatory minimum sentence when he first approached Gerrard and Gilbert, that his bail was reduced from $40,000 to $12,000 immediately after he began cooperating, that the assault charges against him were later dismissed altogether, that Atwell received sex and drugs at the PAB from Gerrard and Gilbert in violation of Directive 82, or that Atwell was himself a suspect in an unrelated, uncharged homicide that Gerrard and Gilbert had closed under "special circumstances" around the same time Atwell began cooperating against Mr. Williams.

158. Nor was the jury told that Edward Williams, the witness the prosecution had relied upon for Plaintiff Mr. Williams' supposed motive, had already recanted his statement under oath months earlier, or that his true whereabouts were known to police even as the prosecution represented to the jury that Edward Williams could not be located.

159. Nor was the jury told the true origin of the .380 cartridge that the ADA introduced into evidence, or that Dr. Hoyer's and James Fort's testimony supporting a "multiple shooter" theory was contradicted by the Commonwealth's own Activity Sheet recording that only two .38 caliber projectiles, not five bullets, were recovered from Rainey's body.

160. Instead, the prosecutor built his closing argument around the false impression that police and prosecutors had exhausted every effort to locate and present Edward Williams, using that fabricated diligence to bolster Atwell's and McClain's credibility and to suggest to the jury that additional, unseen evidence, including the .380 cartridge, corroborated their account of the shooting.

161. The jury returned a verdict of guilty on first-degree murder and related offenses on May 8, 1984.

**PATTERN AND PRACTICE OF DETECTIVE GERRARD AND GILBERT**

162. Mr. Williams' wrongful conviction was not an isolated example of misconduct; it was the product of a longstanding, widespread policy, practice, and custom of the “cold case squad” coercing and fabricating witness statements to close unsolved murders.

163. This practice, publicly exposed as the “sex for lies” scheme, was carried out in substantial part by Gerrard and Gilbert and was known to, tolerated by, and ratified by the City of Philadelphia's final policymakers.

**<u>The Institutional Origins of the Scheme</u>**

164. The origins of “sex for lies” can be traced to a period of documented, systemic abuse of constitutional rights within the PPD beginning in the 1960s.

165. This systemic abuse led to an eight-month investigation into PPD by the United States Department of Justice (“DOJ”).

166. The DOJ investigation found significant evidence of physical brutality, unjustified shootings, illegal stops and searches, arbitrary arrests, coerced confessions, and racial abuse.

167. The DOJ investigation found evidence of a pattern of homicide detectives coercing false statements and evidence that PPD practices deliberately encouraged and entrenched these due process violations.

168. The DOJ investigation culminated in a pattern and practice suit filed against the City of Philadelphia. *See United States v. City of Philadelphia*, 644 F.2d 187, 190 (3d Cir. 1980).

169. The United States District Court found that existing PPD regulations were not designed to address specific violations of civilians' legal and constitutional rights.

170. Gerrard and Gilbert were trained and formed as homicide investigators during this era of documented departmental disregard for the constitutional rights of criminal suspects, and their methods, including the methods used against Mr. Williams, were a direct product of that culture.

***Financial Incentives Driving the Cold Case Squad***

171. Following the litigation of *United States v. City of Philadelphia*, 644 F.2d 187, 190 (3d Cir. 1980), PPD and DAO faced sustained public pressure to raise the Department's homicide clearance rate.

172. In the early 1980s the PPD Homicide Unit created the "cold case squad" to investigate unsolved murders in response to sustained public pressure on PPD and DAO to raise the homicide clearance rate.

173. Detectives assigned to the cold case squad operated with minimal oversight and enjoyed a direct financial incentive to generate arrests and secure inculpatory statements.

174. Detectives were compensated for court appearances and were permitted to work cases around the clock to inflate their overtime wages.

175. Gerrard more than doubled his salary through overtime, and a 1984 internal City audit found that Gerrard was one of only ten police officers in the entire Department who earned more that year than the Police Commissioner.

176. In 1986, Police Commissioner Kevin M. Tucker initiated anti-corruption reforms that eliminated the cold case squad's carte blanche approach to overtime; within a single year, those reforms reduced court overtime in the Homicide Unit by approximately 32.5%, corroborating that the overtime structure Gerrard and Gilbert exploited was both real and, once curtailed, immediately consequential.

177. James Gallagher, then Chief Inspector of the Philadelphia Police Department, later observed that Gerrard and Gilbert's methods of operation omitted any sense of accountability to the command structure, that their assignments were self-generated, that they would not adhere to the authority of their commanding officers, and that they maintained obedience to their former methods of operation rather than the methods instituted by reform-minded command staff.

***<u>Gerrard and Gilbert's Pattern of Violating Police Directive 82</u>***

178. Central to the scheme was Gerrard and Gilbert's routine, willful violation of Philadelphia Police Directive 82, effective March 8, 1982, which governed the processing, transportation, and detention of adult prisoners at the PAB and expressly prohibited any visitors other than attorneys from visiting prisoners held at that facility.

179. Notwithstanding this express prohibition, Gerrard and Gilbert continuously and knowingly arranged unauthorized visits, including sexual visits in exchange for statements implicating targets of the detectives' choosing, including Mr. Williams.

180. Their violations of Directive 82 were pervasive and were not confined to Mr. Williams' case.

181. A joint investigation conducted by the Philadelphia Police Department, the Philadelphia District Attorney's Office, and the Philadelphia Prison Department resulted in a grand jury finding that approximately two hundred Philadelphia prison employees were linked to a scheme involving drug smuggling, inmate escapes, and the exchange of favors for cash and sex.

182. Franklin Lee, a key informant in multiple Gerrard and Gilbert investigations, has since confirmed the operation of the scheme by affidavit and statements to Internal Affairs.

183. Gerrard confirmed the existence of this practice under oath, testifying in both the *Lester* case discussed below and in Mr. Williams' case that it was common police practice to allow “family” visits to detainees held at the PAB, notwithstanding that such visits were flatly prohibited by Directive 82.

184. The Pennsylvania Superior Court and Supreme Court have since rejected Gerrard’s testimony as not credible.

***<u>Judicial and Institutional Findings Establishing the Pattern</u>***

185. At least four separate cases have resulted in judicial findings that Philadelphia police, including Defendants Gerrard and Gilbert specifically, provided sex, drugs, and other benefits to jailhouse informants in exchange for fabricated, false testimony used to secure convictions, and a fifth defendant, Bruce Murray, was separately granted federal habeas relief arising from Gerrard's misconduct.

186. These adjudications gave the City of Philadelphia actual and constructive notice of Gerrard and Gilbert's pattern of misconduct years before Mr. Williams' conviction was vacated.

***Neil Ferber***

187. On September 9, 1981, Neil Ferber was arrested for the murder of organized crime figure Steven Bouras and was convicted on May 1, 1982, in an investigation led by Sergeant Daniel Rosenstein, who later commanded Defendants Gerrard and Gilbert in cold case investigations.

188. A subsequent investigation by Inspector Frank Friel revealed that Rosenstein had used a fabricated sketch to implicate Ferber and had manipulated jailhouse informant Gerald “Jerry” Jordan into falsely testifying that Ferber had confessed to him, in exchange for leniency on pending charges and a visit with his girlfriend while incarcerated, a visit Rosenstein personally arranged.

189. A court-ordered re-polygraph confirmed that Jordan had lied, and Ferber was released. *See Ferber v. City of Philadelphia*, 1994 WL 1251179 (Pa. Ct. Com. Pl.); *Ferber v. City of Philadelphia*, 661 A.2d 470 (Pa. Ct. Com. Pl. 1995).

***Arthur Lester***

190. In *Commonwealth v. Lester*, 392 Pa. Super. 66, 572 A.2d 694 (1990), a case investigated by Gerrard and Gilbert, the Pennsylvania Superior Court found uncontested evidence that Lester had been visited at the PAB by three women who engaged in sexual relations with him in the months following his confession to the 1978 murder of Ronald Pop.

191. The court held that promises of sexual services to a prisoner constitute an inducement sufficient to render a resulting confession involuntary.

192. The Superior Court squarely considered and rejected Gerrard's testimony that the visits were merely permissible “family” visits, crediting instead the testimony of Lester and the three women. The court vacated Lester's sentence.

***Willie Stokes***

193. Willie Stokes was convicted of the October 21, 1980 murder of Leslie Campbell after Gerrard and Gilbert took over the previously unsolved investigation in early 1984 and produced jailhouse informants Anthony Singleton, Franklin Lee, and Aaron Helms.

194. Lee later recanted his preliminary hearing testimony, disclosing that Gerrard and Gilbert had knowingly induced him and Singleton to provide false statements through sex, drugs, and promises of leniency at the PAB.

195. Notwithstanding that recantation, the Commonwealth used Lee's preliminary hearing testimony to convict Stokes and later prosecuted Lee for perjury. United States District Judge Timothy Savage subsequently credited Lee's recantation testimony and vacated Stokes's conviction. *Stokes v. Lamas*, No. 2:20-cv-02192-TJS (E.D. Pa. Dec. 22, 2021).

196. Lee has since further testified that Charles Atwell likewise lied in his testimony against Mr. Williams in exchange for sex, drugs, and criminal leniency from Gerrard and Gilbert, and that Atwell personally introduced Lee and Singleton to Gerrard and coached them to lie about Stokes and other defendants.

***Bruce Murray***

197. Bruce Murray was convicted in 1983 and sentenced to life in 1984 for the December 16, 1980 murder of Eric DeLegal based on coerced testimony, withheld evidence, and misconduct orchestrated by Gerrard.

198. Multiple witnesses later recanted, testifying that Gerrard had physically coerced statements, pressured witnesses to falsely identify Murray, and attempted to manipulate lineup identifications, all while the Commonwealth withheld polygraph results, undisclosed witness

statements, and evidence implicating an alternative suspect who sought treatment for a gunshot wound under Murray's name.

199. Murray's conviction was vacated and a writ of habeas corpus was granted in 2023, expressly acknowledging the flaws in Gerrard's conduct. *See Murray v. Clark*, No. 98-5899 (E.D. Pa. 2023).

***William Franklin***

200. William Franklin was convicted of the October 22, 1976 murder of Joseph Hollis based solely on the statement of jailhouse informant Emmanuel Claitt, procured by Gerrard and Gilbert in 1980 while Claitt faced over thirteen felony charges and the threat of a fabricated murder charge.

201. Claitt later admitted that he fabricated his testimony in exchange for sexual favors and a reduced sentence. A second witness, Robert Mickens, likewise testified that he was coerced into falsely implicating Franklin and co-defendant Major Tillery and was offered sexual encounters with his girlfriends by detectives working with Gerrard and Gilbert.

202. No physical or ballistic evidence ever linked Franklin to the crime scene, and alternative suspects, including Fred Rainey, the victim in Mr. Williams' case, were separately identified.

203. The court vacated Franklin's conviction on February 28, 2024, and in a November 20, 2024 opinion found that Gerrard and Gilbert's promises of sexual services to induce false testimony rendered that testimony coerced and that the Commonwealth's reliance on such coerced testimony as the sole evidence of guilt violated Franklin's constitutional right to a fair trial. *See Commonwealth v. Franklin*, No. CP-51-CR-0605611-1980 (Phila. Ct. Com. Pl. Nov. 20, 2024).

***Additional Homicide Investigations Reflecting the Same Pattern***

204. Beyond these adjudicated exonerations, Gerrard and Gilbert's exploitation of the same informant network and the same inducements recurred across other Philadelphia homicide investigations from the same era, further corroborating that their conduct in Mr. Williams's case was neither isolated nor aberrational.

***The Murder of Julie Revsin***

205. Graduate student Julie Revsin was murdered in her apartment on March 21, 1980. After Aaron Helms, an informant in the Stokes investigation, recanted his cooperation against Stokes, Gerrard and Gilbert retaliated by attempting to frame Helms for the Revsin murder, recruiting Charles Atwell, Jerry Fields, Anthony Singleton, and Franklin Lee, the same network of jailhouse informants used against Mr. Williams and Stokes, to provide false statements implicating Helms.

206. Singleton and Lee knowingly provided false statements and went on to recruit additional witnesses, who, like Helms, later recanted.

207. The scheme collapsed only because records established that Helms was in custody at the time of the murder.

208. A subsequent search of Holmesburg State Prison recovered the homicide summary for the Revsin investigation in the possession of Atwell, Fields, Lee, and Singleton.

209. Singleton and Lee later confessed to authorities regarding Gerrard and Gilbert's role in orchestrating the scheme.

210. The Revsin murder remains unsolved to this day.

***The Murder of Michael Branch***

211. Michael Branch was killed on July 5, 1979, and his case remained cold until Gerrard and Gilbert assumed the investigation shortly after the October 27, 1982 murder of Fred Rainey.

212. As in Mr. Williams's case, Gerrard and Gilbert produced a jailhouse informant, Jerry Fields, then a cellmate of Charles Atwell at Holmesburg, whose statement and trial testimony implicated Fred Rainey and Robert Harrison in the Branch murder.

213. Fields's statement was given eight days after Harrison refused to cooperate with Gerrard and Gilbert's effort to frame Mr. Williams for the Rainey murder, a sequence of events reflecting Gerrard and Gilbert's practice of retaliating against uncooperative witnesses by implicating them in unrelated homicides.

214. A recent affidavit from Gerald Sanders, together with corroborating affidavits from Franklin Lee, identifies Jerry Fields, not Harrison, as the actual shooter, and confirms that Fields was working with Gerrard and Gilbert alongside Atwell and receiving the same category of benefits at the PAB.

***The Murder of Benjamin McNeil.***

215. Benjamin McNeil was shot and killed on October 18, 1980. Witness statements taken during the original investigation, from Michael White, Mary White, and Craig Kemp, identified Charles Atwell as the shooter, acting on the orders of Fred Rainey.

216. When Gerrard and Gilbert assumed the McNeil investigation in January 1983, they disregarded the evidence implicating Atwell and closed the investigation without ever pursuing him as a suspect.

217. Atwell would then become a witness against Mr. Williams.

218. Mr. Williams' case therefore reflects this pattern directly: Charles Atwell was provided access to sex with his girlfriend, Maxine Harris, and drugs from his nephew, Doug Atwell, through Gerrard and Gilbert while Atwell was held at the PAB, in direct violation of Directive 82. PAB logs document eight separate visits between Atwell and Ms. Harris lasting upwards of three hours apiece.

***The Sex for Lies scheme Was Known to and Ratified by the City of Philadelphia***

219. The scheme described above was corroborated not merely by the accounts of individual victims of the scheme, but by objective, contemporaneous records, including PAB visitor logs documenting the very visits Directive 82 prohibited, sworn admissions from Gerrard and Gilbert's own informants describing how the scheme operated, and the Philadelphia District Attorney's Office's own internal investigation, conducted in part through a search of Holmesburg Prison, which surfaced evidence of the scheme's operation across multiple homicide investigations, including the investigation of Mr. Williams.

220. Despite this evidence, and despite the Pennsylvania Superior Court's own published findings in Lester establishing the same detectives' pattern of coercion years before Mr. Williams' initial post-conviction proceedings, the City of Philadelphia continued for decades to represent that no such practice existed and that Gerrard's denials should be credited over the mounting evidence to the contrary.

221. The City's final policymakers thus had actual and constructive notice, no later than the Superior Court's 1990 decision in Lester, that Gerrard and Gilbert were engaged in a pattern of coercing and fabricating witness testimony through prohibited inducements of sex, drugs, and leniency, and repeatedly failed to take appropriate remedial or disciplinary action to curb

that misconduct, notwithstanding its recurrence across numerous other homicide investigations from the same era.

***POST-TRIAL PROCEEDINGS***

222. Following his conviction, Mr. Williams retained Leonard Rubin, Esquire, and filed post-verdict motions to vacate or set aside the verdict.

223. At a post-trial hearing in March 1986, Edward Williams described several conversations with Charles Atwell. In one, Atwell admitted he had heard the shots but had not seen the shooting. In another, Atwell asked Edward Williams to tell co-defendant Andre Harvey that Atwell would recant his statement in the Rainey case if two witnesses against Atwell in an unrelated matter changed their testimony.

224. The trial court rejected this claim on the ground that the testimony could have been elicited at trial. But Plaintiff Mr. Williams' trial counsel, Harry Seay, Esquire, had no way of knowing what Edward Williams would say. The Commonwealth had concealed both Edward Williams' recantation and his whereabouts and had told the jury he could not be located.

225. The court denied all post-verdict motions. On February 3, 1987, it sentenced Mr. Williams to life imprisonment for first-degree murder, followed by a consecutive term of five to ten years for criminal conspiracy.

226. Represented by Joel Moldovsky, Esquire, Mr. Williams appealed to the Pennsylvania Superior Court, which affirmed on November 16, 1987. The Pennsylvania Supreme Court denied allowance of appeal, and the judgment of sentence became final on May 5, 1988.

227. Williams then began more than three decades of post-conviction litigation.

228. On December 28, 1988, Mr. Williams filed a timely pro se PCRA petition. An amended petition followed on January 18, 1990. His counsel, Jeremy Gelb, Esquire, filed further

amended petitions on September 15, 1992 and February 12, 1996. Those petitions alleged newly discovered evidence that Charles Atwell had received drugs, sexual favors, and leniency in exchange for false eyewitness testimony against Mr. Williams and Harvey. The leniency concerned a previously unknown homicide and two aggravated assaults.

229. The Commonwealth strenuously denied these allegations. It did so even though its own files showed that Atwell was a suspect in the McNeil homicide, as described above.

230. In February 1997, the Honorable Genece E. Brinkley held an evidentiary hearing. Mr. Williams presented testimony that Atwell received sexual favors and drugs in exchange for implicating him. That testimony included an account from the woman brought to the PAB to have sex with Atwell.

231. Gerrard testified that Atwell's visits at the PAB were ordinary family visits so Atwell could see his children, and that such visits were common. This was the same "family visit" explanation the Superior Court had rejected in Lester seven years earlier.

232. The Commonwealth conceded that the visits Gerrard allowed violated Police Directive 82. Judge Brinkley nonetheless denied relief, crediting the denials of Atwell and Gerrard.

233. The subsequent appeal was unsuccessful.

234. On September 11, 2020, Mr. Williams filed a pro se PCRA petition based on a newly discovered June 7, 1983 Criminal Complaint and Warrant for Arrest. ADA John J. Flannery prepared that document after obtaining Atwell's June 1, 1983 statement, and it was never part of the certified record. It contradicted Flannery's trial testimony on May 1, 1984 that he had been unaware Atwell was an eyewitness to the Rainey murder. The petition also sought the Internal Affairs files of Gerrard and Gilbert.

235. Appointed counsel Gary S. Server, Esquire, filed a no-merit letter on January 18, 2021.

236. During the week of March 8, 2021, Server learned of a July 5, 2019 affidavit from Paul Atwell, Charles Atwell's brother. Co-defendant Harvey had obtained it and forwarded it.

237. Paul Atwell swore that when Rainey was shot, he, Charles Atwell, and Marvin McClain were at the recreation center on 26th Street between Jefferson and Master Streets. They ran to 27th and Oxford only after hearing that Rainey had been shot, and by then police were already holding the crowd back.

238. Paul Atwell further swore to what happened after Charles Atwell's May 1983 arrest for the aggravated assaults on James Mitchell and Floyd Sutton. Charles asked Paul to contact Gerrard and say he had information about the Rainey murder. Charles later told Paul that the detectives had promised him private visits with Maxine Harris twice a month and dismissal of his assault cases. He also said the detectives had let him read their report on the Rainey murder so he would know what to say.

239. On April 18, 2021, Server withdrew the no-merit letter and filed an Amended PCRA petition. It presented the Paul Atwell affidavit as after-discovered evidence, along with an affidavit from Franklin Lee.

240. Mr. Williams then retained Dan Purtell, Esquire. The Philadelphia District Attorney's Office permitted counsel to review its investigative and prosecution files.

241. That review, together with further investigation by Mr. Williams' later counsel, revealed the fabrication, coercion, and concealment described above. This included:

a. the suppressed alternative-suspect evidence;

b. the withheld impeachment evidence about Atwell's role in an uncharged homicide;

c. documents showing that police and prosecutors misrepresented Edward Williams' whereabouts and recantation to the trial court and jury.

242. On June 3, 2024, Mr. Williams, through Mincey Fitzpatrick Ross, LLC, filed a Supplement to his Amended PCRA Petition. It alleged serial *Brady* and *Napue* violations and sought dismissal of the charges with prejudice.

243. On December 4, 2024, the Commonwealth filed its Reasons for Proposing a Negotiated Resolution. In it, the Commonwealth acknowledged two points. First, documents identifying James Hampton as an alternative suspect apparently were not disclosed before trial. These included Officer Cummings' statement and an October 29, 1982 Activity Sheet, and one of them recorded that Hampton carried a .38 caliber revolver. Second, Mr. Williams' claims had arguable merit, and a post-conviction court could grant him a new trial.

244. On December 5, 2024, the Court of Common Pleas, the Honorable Scott DiClaudio presiding, vacated Mr. Williams' first-degree murder conviction.

245. To secure his release without further protracted litigation, Mr. Williams pleaded guilty to third-degree murder. He was sentenced to 20 years to time served, followed by five years of reporting probation.

246. Mr. Williams was released after approximately forty-one years in custody.

## CAUSES OF ACTION

### COUNT I: 42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial Under the Fourteenth Amendment

*Lawrence Gerrard and Ernest Gilbert through the administrators of their estates*

247. Plaintiff incorporates by reference all of the foregoing paragraphs.

248. The individual defendants, acting individually and in concert, and within the scope of their employment with the PPD, deprived Mr. Williams of his clearly established constitutional right to due process of law and to a fair trial by:

249. Count IA – Fabrication: The defendant detectives fabricated, coerced, and/or manipulated evidence including but not limited to the coerced statement of Edward Williams; the manufactured and materially inconsistent statements of Charles Atwell and Marvin McClain; the manufactured statement of Archie Scott; and a materially false and misleading Affidavit of Probable Cause; and

250. Count IB – Deliberate Deception: The defendant detectives deliberately deceived counsel and the court by concealing and/or suppressing relevant and material evidence, including but not limited to the Edward Williams recantation and location evidence, the McNeil evidence, the alternative suspect evidence, and the shots-from-the-car evidence.

251. The individual defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Williams's clearly established constitutional rights. No reasonable officer in 1982–1984 would have believed this conduct was lawful.

**WHEREFORE**, Plaintiff demands judgment in his favor, and against all individual Defendants jointly and severally pursuant to 42 U.S.C. § 1983 including interest, delay damages, costs of suit, compensatory and punitive damages, and attorneys' fees under U.S.C. §1985 and §1988, and any other remedies legally appropriate.

**COUNT II: 42 U.S.C. § 1983 Civil Rights Conspiracy**

*Lawrence Gerrard and Ernest Gilbert through the administrators of their estates*

252. Plaintiff incorporates by reference all of the foregoing paragraphs.

253. The individual defendants, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals, including Charles Atwell, Marvin McClain, and Archie Scott, to act in concert in order to deprive Mr. Williams of his

clearly established Fourteenth Amendment rights to be free from deprivation of liberty without due process of law, and to a fair trial.

254. In furtherance of the conspiracy, the defendants engaged in and facilitated numerous overt acts, including, but not limited to the following:

a. Coercing and fabricating witness statements, and offering and delivering inducements, including bail reductions, dismissal of pending criminal charges, and improper jailhouse visits in violation of Police Directive 82, in exchange for false, coordinated statements implicating Mr. Williams;

b. Deliberately deceiving counsel and the court by concealing and/or withholding relevant and material evidence, submitting a materially false and misleading Affidavit of Probable Cause, and eliciting and permitting false testimony regarding Edward Williams' availability; and

c. Failing to conduct a reasonably thorough and fair investigation that considered the consistent accounts of neutral, contemporaneous eyewitnesses, and ignoring evidence identifying alternative suspects.

**WHEREFORE**, Plaintiff demands judgment in his favor, and against all individual Defendants jointly and severally pursuant to 42 U.S.C. § 1983 including interest, delay damages, costs of suit, compensatory and punitive damages, and attorneys' fees under U.S.C. §1985 and §1988, and any other remedies legally appropriate.

**COUNT III: 42 U.S.C. § 1983 Failure to Intervene**

*Lawrence Gerrard and Ernest Gilbert through the administrators of their estates*

255. Plaintiff incorporates by reference all of the foregoing paragraphs.

256. By their conduct, under color of state law and acting within the scope of their employment with the PPD, the individual defendants had opportunities to intervene on behalf of Mr. Williams to prevent the deprivation of liberty without due process of law and to ensure his right to a fair trial, but with deliberate indifference failed to do so.

257. The defendants' failures to intervene violated Mr. Williams's clearly established constitutional right not to be deprived of liberty without due process of law and a fair trial as guaranteed by the Fourteenth Amendment. No reasonable police officer in 1982–1984 would have believed that failing to intervene to prevent these defendants from coercing and fabricating inculpatory evidence, offering improper inducements to secure false witness statements, submitting a materially false Affidavit of Probable Cause, deliberately deceiving counsel and the court, and causing Mr. Williams to be subjected to an unfair trial, were lawful.

**WHEREFORE,** Plaintiff demands judgment in his favor, and against all individual Defendants jointly and severally pursuant to 42 U.S.C. § 1983 including interest, delay damages, costs of suit, compensatory and punitive damages, and attorneys' fees under U.S.C. §1985 and §1988, and any other remedies legally appropriate.

**COUNT IV: 42 U.S.C. § 1983 Municipal Liability Claim**
*City of Philadelphia*

258. Plaintiff incorporates by reference all of the foregoing paragraphs.

259. The City of Philadelphia, by and through its final policymakers, had in force and effect during the time of Mr. Williams's arrest and trial, and for many years preceding and following the trial, a policy, practice, or custom of unconstitutional conduct within its Homicide Unit's cold case squad, including coercing and fabricating witness statements

through inducements of sex, drugs, bail reductions, and leniency on pending or potential criminal charges; concealing and/or withholding exculpatory evidence; submitting materially false affidavits of probable cause; and failing to conduct a reasonably thorough and fair investigation.

260. Policymakers for the City of Philadelphia had actual or constructive notice of the above practices, policies, and customs: including through the Superior Court's own published findings in *Commonwealth v. Lester*, 392 Pa. Super. 66, 572 A.2d 694 (1990), involving the same detectives and the same "sex for lies" scheme; but repeatedly failed to undertake any meaningful investigation or to take appropriate remedial and/or disciplinary action to curb that misconduct notwithstanding its recurrence across numerous other homicide investigations from the same era.

**WHEREFORE**, Plaintiff demands judgment in his favor, and against Defendant City of Philadelphia pursuant to 42 U.S.C. § 1983 including interest, delay damages, costs of suit, compensatory damages, and attorneys' fees under U.S.C. §1985 and §1988, and any other remedies legally appropriate.

*//s// Mark V. Maguire*
Mark V. Maguire, Esquire
Daniel N. Purtell, Esquire
Elizabeth Schwab, Esquire
**McELDREW PURTELL**
1845 Walnut Street, 20th floor
Philadelphia, PA 19103
215-545-8800
mmaguire@mceldrewpurtell.com
dan@mceldrewpurtell.com
eschwab@mceldrewpurtell.com